IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| ROSE STABLER, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | )   CIVIL ACTION 11-0103-WS-N |
| | ) |
| FLORIDA VAN LINES, INC., | ) |
| | ) |
|     Defendant. | ) |

**ORDER**

This matter comes before the Court on the Motion for Summary Judgment (doc. 28) filed by defendant, Florida Van Lines, Inc. The Motion has been briefed and is now ripe for disposition.[1]

**I.    Background.**

*A.    Nature of the Case.*

This action arises from the loss of and/or damage to certain household goods during an interstate residential move. In particular, plaintiff, Rose Stabler, relocated from Ono Island, Alabama, to New Orleans, Louisiana in or about February 2009.[2] Defendant, Florida Van Lines,

---

[1] The Rule 16(b) Scheduling Order entered by Magistrate Judge Nelson provides, in part, that "[i]f a party's exhibits in support of or in opposition to a motion exceed 50 pages in the aggregate, then that party must deliver a courtesy hard copy of those exhibits to the Judge's chambers by mail or hand delivery." (Doc. 6, ¶ 13(c).) Here, each side has submitted in excess of 50 pages of exhibits in support of its legal memorandum, yet neither side has complied with the courtesy-copy requirement. The Court in its discretion will consider these filings at this time, despite the omission.

[2] Defendant's summary judgment brief alleges that the subject events took place in February 2010; however, the pleadings and defendant's own exhibits leave no doubt that the actual time frame of Stabler's move was February 2009. For example, Florida Van Lines' invoice to Pack & Load Services in connection with the Stabler job was dated February 6, 2009. (Doc. 29, Exh. D.) And the estimate/order paperwork for the moving job reflected a pack date of "2/5/2009" and a deliver date of "2/6/2009." (*Id.* at Exh. E.) Thus, defendant's references to February 2010 appear to be typographical errors.

Inc., allegedly provided services to her in connection with that move. Stabler was dissatisfied with those services, so she filed suit against Florida Van Lines in state court.

In her Second Amended Complaint, Stabler alleges causes of action against Florida Van Lines for breach of contract, negligence, wantonness, negligent supervision, wanton supervision, conversion and a claim under the Carmack Amendment, 49 U.S.C. § 14706.[3] The well-pleaded facts upon which such causes of action rest include allegations that Florida Van Lines and another entity (Pack & Load Services, Inc.) failed properly to tag and inventory her household goods; used insufficient padding or packaging on various items; handled plaintiff's goods in a manner resulting in loss, theft or damage to many items; packed certain "wrong items" for delivery; and rendered PODS units overloaded or inaccessible.

Of potential significance to the issues presented on summary judgment, the Second Amended Complaint named Pack & Load Services, Inc. ("Pack & Load") as a defendant in this matter, along with Florida Van Lines. In an Order (doc. 2) entered on March 21, 2011, however, this Court recognized that Stabler had settled her claims against Pack & Load, that all of her claims against that entity had been dismissed, and that Pack & Load was no longer a defendant to this action.[4] As such, this case now proceeds solely as between Stabler and Florida Van Lines.

---

[3] Inasmuch as the Carmack Amendment claim plainly arises under federal law, presents a federal question, and involves a matter in controversy exceeding $10,000, Florida Van Lines' removal of this action to federal court on February 24, 2011 was jurisdictionally sound pursuant to 28 U.S.C. §§ 1331 and 1337. Federal jurisdiction would also be proper under 28 U.S.C. § 1332, inasmuch as Stabler and Florida Van Lines are of diverse citizenship and the amount in controversy (as pleaded in the Second Amended Complaint) plainly exceeds $75,000 because plaintiff claims $100,000 in damages on the Carmack Amendment claim alone.

[4] The summary judgment record reflects that Pack & Load paid Stabler approximately $2,000 in exchange for her executing a settlement agreement that may have contained a release. (Stabler Dep., at 128.) Plaintiff indicates that she viewed this settlement as "a slap in the face after what I had been through." (*Id.*) Nonetheless, she does not contest the existence of an enforceable settlement agreement terminating her claims against Pack & Load. The remaining defendant, Florida Van Lines, insinuates that the Pack & Load settlement requires dismissal of Stabler's claims against it as well; however, Florida Van Lines has made no showing that plaintiff's claims against it were encompassed by any release she may have signed in favor of Pack & Load. Neither the settlement agreement nor any release contained therein is part of the record at this time; therefore, the Court expresses no opinions and makes no findings as to the scope of that release and defendant's unsupported allusion that the Pack & Load settlement may be dispositive of Stabler's claims against Florida Van Lines.

B.    *Relevant Facts.*[5]

1.    *The Packing, Loading and Moving of Plaintiff's Household Goods.*

In the light most favorable to plaintiff, the record reflects that in January 2009 she contacted Pack & Load and subsequently made arrangements to hire that company "to pack [her] personal belongings and load them onto PODs units for storage and to move other items to [her] new home in New Orleans, Louisiana," from her then-residence in Ono Island, Alabama. (Stabler Aff. (doc. 36, Exh. 1), at 1.)[6] More specifically, certain of Stabler's household goods at the Ono Island location were to be packed and loaded into portable storage units for transportation to a storage facility at Brookley Field in Mobile, Alabama, while others were to be packed and transported to her apartment in New Orleans. (Stabler Dep., at 26.) Stabler leased the PODS units from a third-party vendor; however, she directed Pack & Load / Florida Van Lines to load designated items from the Ono Island home into those units. (*Id.* at 34-35.) This move was "very important" to Stabler, so she devoted a great deal of time and attention to the advance planning of same. (*Id.* at 45.)

From the outset, there was considerable ambiguity as to whether Stabler was dealing with Pack & Load or Florida Van Lines or both. Her testimony is that when she called Pack & Load's offices, the person answering the phone "would say Florida Van Lines." (Stabler Dep., at 36.) Stabler contends that in making the arrangements with Pack & Load to have her things moved, its representatives would sometimes identify themselves as "Florida Van Lines." (Stabler Aff., at 1.) And the moving truck that arrived at the Ono Island residence on move-out day to collect Stabler's belongings was clearly labeled a "Florida Van Lines truck," and not a Pack & Load

---

[5]    The Court is mindful of its obligation under Rule 56 to construe the record, including all evidence and factual inferences, in the light most favorable to the nonmoving party, resolving all reasonable doubts about the facts in favor of the non-movant. *See Skop v. City of Atlanta, GA*, 485 F.3d 1130, 1136 (11th Cir. 2007). Thus, plaintiff's evidence is taken as true and all justifiable inferences from the record are drawn in her favor.

[6]    In selecting Pack & Load to perform the job, Stabler was persuaded by the company's assurances "that anything that was upholstered would be shrink wrapped, anything glass and collectable would be shrink wrapped," which was important to her because of various collectable possessions that she wanted "delicately handled." (*Id.* at 35.) Also important to Stabler in her selection decision was Pack & Load's assurance that it would "take very good care of [her] collectables." (*Id.* at 38.)

truck. (Stabler Dep., at 36.) From these and other circumstances, Stabler professed uncertainty as to which company she was dealing with at particular times because "it was like they were interchangeable." (*Id.*)[7]

Be that as it may, Stabler's understanding was that Pack & Load / Florida Van Lines "were to come and pack up everything, put them in the PODS, deliver the PODS to Brookley Field and bring the rest of the items to New Orleans." (*Id.* at 39.) To that end, at approximately 8:00 a.m. on February 3, 2009, a crew of two men arrived at Stabler's Ono Island home in a large Florida Van Lines moving truck. (*Id.* at 45-46.) One of these workers was Fred Williams, who was wearing a Florida Van Lines uniform. (Stabler Aff., at 2.) The PODS units into which certain goods were to be loaded had been dropped off at Stabler's home earlier that morning. (Stabler Dep., at 46.) For the next two days, the crew (along with Stabler herself) set to work on the move-out process.

To differentiate between goods bound for the PODS units and those to be taken to New Orleans, Stabler tagged the New Orleans items, provided written lists to the movers documenting which items should go to New Orleans, and "supervised these workers telling them to do this, do that." (Stabler Dep., at 27-29.)[8] Stabler acknowledges that she "was with them working really closely every day" during the packing and loading process. (*Id.* at 28.) As the work crew reached each new area of the house, Stabler would describe to them in detail what she wanted them to do with her belongings in that location. (*Id.* at 52.) She acknowledges that she was "very involved in the moving process." (*Id.*) In Stabler's words, "I did pretty much everything an individual could do that was in my situation." (*Id.* at 54.) However, she did not oversee or direct the work crew's every movement and act in her home; rather, frequently the crew would be working in one area while Stabler was packaging up certain of her belongings in boxes elsewhere. (*Id.* at 52-53.) Thus, Stabler did not hover over the movers, directly monitoring their

---

[7] Further facts concerning the relationship between Pack & Load and Florida Van Lines will be set forth *infra*.

[8] Stabler adorned the items to be shipped to New Orleans with tags bearing the words "New Orleans." (*Id.* at 28.) PODS items were not tagged. (*Id.* at 29.) As for the written lists Stabler provided the movers documenting which items were going where, Stabler prepared those "pretty detailed" lists the week before the movers arrived. (*Id.* at 31.) Stabler "walked them through with these lists" during the process. (*Id.*)

activities all day long.  The record is clear that Stabler packed certain items into boxes, closed and labeled the boxes, and asked the movers to place them onto the truck.  (*Id.* at 53.)  In her words, she was "really busy packing things downstairs" while the movers were working in other parts of the home.  (*Id.* at 56.)  Nonetheless, Stabler had no concerns at the time, and believed that the movers were following her directions.  (*Id.* at 65.)  Stabler's testimony is that all of her personal items were in "good condition" when the movers packed and loaded them.  (Stabler Aff., at 2.)

The packing and loading process took two full days, being February 3 and 4, 2009.  (Stabler Dep., at 55-56.)  Late in the second day, Stabler realized that she was going to have to "leave a lot of things behind that [she] did not plan on leaving behind" because the movers had not packed them.  (*Id.* at 88-89.)  The two PODS units were apparently full, and additional items that she wanted placed into storage would not fit into them.  Stabler faults the movers for not notifying her of this problem in time to have another PODS unit delivered to that location.  (*Id.* at 89.)  In any event, the two PODS units were locked by the movers and picked up by the PODS vendor (which is not a party to these proceedings) on the evening of the second day, when the house was finished being packed.  (*Id.* at 39, 99-100.)  That third party then transported the PODS units to Brookley Field for storage purposes.  (*Id.* at 39, 99.)  Stabler retained custody and control of the only key to the locks on the PODS units.  (*Id.* at 101.)

Many items from Stabler's Ono Island home were neither loaded into the PODS units nor placed on the Florida Van Lines truck.  Those household goods were disposed of in various ways.  In particular, Stabler alerted a charity and a preschool that they "could have whatever was left in the house … said whoever gets here first you can have it, because there was a lot of things."  (Stabler Dep., at 88.)  "[T]he charities came down there fairly quickly."  (*Id.* at 95.)  In addition to the charity and the preschool, Stabler told her housekeeper and the housekeeper's boyfriend (both of whom she had hired to clean the house) that "they could have anything that they saw that was left behind."  (*Id.*)  Furthermore, Stabler unilaterally conveyed many of her unwanted household belongings to the movers themselves.[9]  So the end result was that some of

---

[9]     In fact, Stabler was quite generous in giving the movers personal belongings that she did not want either loaded in the PODS units or transported to New Orleans.  As Stabler summarized these gifts, "I gave them enough clothes to dress … young women, teenage girls, very well for a long, long time.  I gave them electronics.  I gave them artwork.  I gave them
(Continued)

Stabler's items were placed in PODS units for storage at Brookley Field, others were loaded onto the Florida Van Lines truck for transport to her New Orleans, still others she gave to the movers to keep, and anything left behind was made available for the taking, first-come first-served, as offered to a charity, a preschool, and Stabler's personal cleaning crew. No comprehensive itemized lists appear to exist showing which items ended up where.

Ultimately, as to Stabler's household goods that were transported to her Louisiana apartment, "[a] Florida Van Lines truck brought them to New Orleans, with one of the guys that packed." (Stabler Dep., at 39.) Fred Williams was the mover who drove the Florida Van Lines truck to New Orleans and proceeded to unload Stabler's goods there. It is undisputed that Williams was an employee of Florida Van Lines, and that he reported directly to Florida Van Lines' vice president of operations, Doug Prescott. (J. Prescott Dep., at 16.)[10] Stabler also hired a second, local person to help the Florida Van Lines driver unload the truck at her New Orleans apartment. (Stabler Dep., at 105-06.)

When Stabler unpacked her belongings in New Orleans, she was dissatisfied in many respects. For instance, rather than using the packing blankets to protect her goods, the movers had simply shipped the blankets by themselves in a separate box delivered to New Orleans. (Stabler Dep., at 44.) Thus, her household items were deprived of necessary (and available) padding and protection. Stabler also noticed that various items were missing, and requested of Florida Van Lines / Pack & Load that they be returned to her; however, no such items were returned. (*Id.* at 85-86.) For example, Stabler soon realized that her fur coats and linens were missing. (*Id.* at 114, 116.) She also noticed property damage to her household goods that were delivered to the New Orleans apartment, including substantial damage to various parts of a three-

---

televisions. I gave them so many things. … I thought I was being generous with these guys." (*Id.* at 66.) Although she did not maintain an inventory of the items she gave to the movers, she testified at length to those items in her deposition. (*Id.* at 66-77, 81-82, 94.)

[10]    Defendant's position, which will be explored in greater detail *infra*, is that even though he was nominally a Florida Van Lines employee at all relevant times, Williams "was borrowed by and worked for Pack and Load to pack and transport plaintiff's belongings." (Defendant's Interrog. Responses (doc. 36-5), at #2.)

tiered marble table.  (*Id.* at 110.)  The critical point is that, according to Stabler, "[m]any items arrived in a damaged condition or were lost and/or stolen."  (Stabler Aff., at 2.)

Within a month after the move, Stabler went to Brookley Field to examine the contents of the PODS units.  (Stabler Dep., at 116-17.)  She found them in disarray or, in her words, "a nightmare."  (*Id.* at 119.)  One unit was jammed full of outdoor furniture, mattresses and beds, with the sheets still on them, all jumbled together, with associated damage to various items.  (*Id.* at 116.)  For example, in perusing the contents of the PODS units, Stabler observed a damaged ball and clawfoot table that was "just thrown up in there."  (*Id.*)

By Stabler's tally, the loss she has incurred as a result of damaged and missing items in connection with her February 2009 move is "a minimum of approximately $100,000.00."  (Stabler Aff., at 2.)

### 2. *The Relationship Between Pack & Load and Florida Van Lines.*

The parties' briefs devote substantial attention to questions such as whether Pack & Load or Florida Van Lines performed the subject moving services, whether the Florida Van Lines worker was a "borrowed servant" for whose acts and omissions Pack & Load bore sole legal responsibility, and whether one company acted as the agent of the other.  As such, some background information concerning the two companies is germane to the analysis.

Nominally, at least, Pack & Load and Florida Van Lines are distinct companies with distinct functions.  (J. Prescott Dep., at 23.)[11]  Pack & Load provides packing and loading services, while Florida Van Lines is a moving business.  (*Id.* at 24.)  More precisely, Florida Van Lines is "a transportation company," while Pack & Load "is a company that provides laborers to pack and load goods."  (J. Prescott Aff., ¶¶ 3-4.)  Defendant maintains that the two businesses are not related.  (J. Prescott Dep., at 23.)  Defendant further shows that each company has its own corporate form, shareholders and bank accounts, and no funds are intermingled.  (J. Prescott Aff., ¶ 5.)  Nonetheless, there is considerable overlap between them.  Both entities are headquartered in the same facility in Clearwater, Florida.  (J. Prescott Dep., at 6.)  They share officers, as Jerry Prescott is the president of Florida Van Lines and the vice president of Pack &

---

[11]    The name "Mid-State Services" also surfaces occasionally in the summary judgment record.  It is undisputed that Mid-State Services and Florida Van Lines are one and the same entity.  (*Id.* at 15.)

Load.  (*Id.* at 5-6.)  Prescott's son, Doug Prescott, is the president of Pack & Load.  (*Id.* at 6.)[12] Jerry Prescott and his wife both own Florida Van Lines and are part owners of Pack & Load. (*Id.* at 25.)  Certain employees regularly provide services for both companies, but receive paychecks from Florida Van Lines, although Florida Van Lines classifies this arrangement as the leasing of its employees to Pack & Load.  (*Id.* at 10-15, 25.)  As further evidence of overlapping operations, plaintiff shows that she would call Pack & Load, only to have the person answering the phone identify the office as Florida Van Lines, and that the company's representatives appeared to use the two names interchangeably in her dealings with them.

By defendant's admission, both Florida Van Lines and Pack & Load were involved in the events giving rise to this lawsuit.  To be sure, defendant's litigation position is that "Florida Van Lines was not hired by Plaintiff and did not contract to provide any services to Plaintiff." (Defendant's Interrog. Responses (doc. 36-5), at #2.)  But even defendant acknowledges that each company played a role in the Stabler job as follows: (i) "Florida Van Lines simply transported Plaintiff's goods to New Orleans;" and (ii) "[t]he goods were loaded onto the truck by and at the direction of Pack and Load."  (*Id.* at #4.)  Thus, according to defendant, "Florida Van Lines was responsible for locking the container to be transported and driving the truck" (*id.* at #10), but nothing further.

When Stabler made arrangements with Florida Van Lines / Pack & Load concerning her move, she received an "Estimate/Order" form agreement listing "Pack & Load Services, Inc." as the "Agent" and not referencing Florida Van Lines at all.  (Doc. 29, Exh. E, at 3.)  That agreement specified that Pack & Load "is providing packing and loading services only.  We are not a transportation company nor assume any liability during transportation."  (*Id.*)  Likewise, the ensuing "Work Order" bears the name "Pack & Load Services" and makes no reference to Florida Van Lines.  (*Id.* at 10.)  Evidently, Pack & Load Services then contracted directly with Florida Van Lines for employee leasing and transportation services for the Stabler job.  After the work was completed, Florida Van Lines sent invoices to Pack & Load for services labeled "Load/Unload PODS" and "Stabler #20545."  (Doc. 29, Exh. D.)  Pack & Load issued checks to

---

[12]   Although he presently holds no position in Florida Van Lines, until the summer of 2010, Doug Prescott served as the vice president of operations for that entity.  (*Id.* at 6, 8.)  As such, at the time of Stabler's move, the president and vice president, respectively, of Florida Van Lines were also the vice president and president of Pack & Load.

"Mid-State Moving & Storage" (which everyone agrees is another name for Florida Van Lines) in full payment of those invoices. (*Id.*)  Again, it is undisputed that Fred Williams is a Florida Van Lines general employee, that he appeared at Stabler's home in a Florida Van Lines truck and wearing a Florida Van Lines uniform on moving day, and that he was heavily involved in the loading, transport and unloading of Stabler's household goods.

## II.   Summary Judgment Standard.

Summary judgment should be granted only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Rule 56(a), Fed.R.Civ.P.  The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial."  *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir. 1991). Once the moving party has satisfied its responsibility, the burden shifts to the non-movant to show the existence of a genuine issue of material fact.  *Id.*  "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment."  *Id.*  (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted).  "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter.  Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Tipton v. Bergrohr GMBH-Siegen*, 965 F.2d 994, 999 (11th Cir. 1992) (internal citations and quotations omitted). "Summary judgment is justified only for those cases devoid of any need for factual determinations."  *Offshore Aviation v. Transcon Lines, Inc.*, 831 F.2d 1013, 1016 (11th Cir. 1987) (citation omitted).

## III.   Analysis.

### A.   *Florida Van Lines and the Borrowed Servant Doctrine.*

As its first basis for seeking summary judgment, defendant argues that all packing and loading of Stabler's household goods was performed by Pack & Load, such that Florida Van Lines cannot be held liable for any errors, omissions or problems as to those functions.[13]  In

---

[13] Of course, this argument does not and could not apply to Stabler's claims concerning the transport and delivery of her household goods to the New Orleans apartment. (Continued)

support of this contention, defendant relies on evidence that plaintiff's contract was with Pack & Load, her paperwork was with Pack & Load, her payment was to Pack & Load, and her post-move claims process was with Pack & Load.  Plaintiff's obvious rejoinder is that the packing and loading services were performed to a large extent by Fred Williams, a Florida Van Lines employee who was wearing a Florida Van Lines uniform when he packed and loaded Stabler's household goods onto a Florida Van Lines truck.

Even though its general employee was plainly a direct, active participant in the events giving rise to this litigation, defendant insists that it cannot be held liable for his packing and loading of Stabler's household goods because Williams was a "borrowed servant" under Pack & Load's control at that time.  Pursuant to the so-called "borrowed servant" or "loaned servant" doctrine, "[w]hen one person puts his servant at the disposal of another for the performance of a particular service for the latter, the servant, in respect of his acts in that service, is to be dealt with as the servant of the latter ***and not of the former***."  *Ware v. Timmons*, 954 So.2d 545, 551 n.7 (Ala. 2006) (citation omitted); *see also Proctor v. Fluor Enterprises, Inc.*, 494 F.3d 1337, 1344 (11th Cir. 2007) (describing Alabama's borrowed servant doctrine as providing that employee in general service of one employer may be transferred for particular work assignment to third-party employer, in which case "the third-party employer that borrowed the employee accepts liability for the employee's work on that particular assignment, and the general employer is not liable.").[14]  This common-law principle has been embraced by Alabama courts as "an

---

Florida Van Lines readily concedes that it (and not Pack & Load) "transport[ed] Plaintiff's belongings from Ono Island, Alabama, to New Orleans, Louisiana."  (Doc. 29, at 5; *see also* doc. 29, at 8 ("[t]here is no dispute that FVL was responsible for the transportation of Plaintiff's belongings").)  Defendant must yield on this point, given its admission that Pack & Load "owns no trucks or drivers and is not capable or licensed to transport any goods."  (J. Prescott Aff., ¶ 7.)  Because Pack & Load could not have transported Stabler's goods to Louisiana and no third-party entities were involved, Florida Van Lines must have done so.  Accordingly, the "borrowed servant" defense has no bearing on Stabler's claims relating to Florida Van Lines' transport of her household goods (as opposed to the packing and loading of same).

[14]    *See also Langfitt v. Federal Marine Terminals, Inc.*, 647 F.3d 1116, 1122 (11th Cir. 2011) ("an employee directed or permitted by his employer to perform services for another principal may become the employee – *i.e.*, the 'borrowed servant' – of the borrowing principal in performing those services," in which case "the borrowing principal is considered the 'borrowing employer' and it is he, and not the employee's general employer, that is held vicariously liable to (Continued)

-10-

affirmative defense for which the defendant bears the burden of pleading and proof." *Proctor*, 494 F.3d at 1350.

"The ultimate test in determining whether an employee has become a loaned servant is a determination of whose work the employee was doing and under whose control he was doing it." *Id.* at 1344 (citation omitted). "It is not the actual exercise of control which is determinative but rather the reserved right to control the employee." *Hauseman v. University of Alabama Health Services Foundation*, 793 So.2d 730, 736 (Ala. 2000) (citations omitted); *see also United States Steel Corp. v. Mathews*, 73 So.2d 239, 242 (Ala. 1954) ("He is master who has the supreme choice, control and direction of the servant and whose will the servant represents in the ultimate result and in all its details."). Further, "it is the entity's right to control the manner and means of the employee's work" that is relevant, "not the mere right to set general guidelines." *Defoor v. Evesque*, 694 So.2d 1302, 1304 (Ala. 1997) (citations omitted). In assessing whether the borrowing principal enjoys the requisite right of control over another's employee, courts consider such factors as whether there was an express transfer of control, whether the borrowing principal exercised control, whether the borrowing principal paid the employee, whether the borrowing principal furnished necessary equipment, and whether the borrowing principal could terminate the relationship with the employee. *See Langfitt v. Federal Marine Terminals, Inc.*, 647 F.3d 1116, 1123 (11th Cir. 2011) ("Probative considerations of the borrowing principal's right to control might therefore include: (1) direct evidence that the general employer expressly transferred control to the borrowing principal or that the borrowing principal exercised control; (2) evidence that the borrowing principal was responsible for paying the employee; (3) evidence that the borrowing principal furnished equipment necessary for performance of the work; and (4) evidence that the borrowing principal had the right to terminate its relationship with the employee").

"Whether one who is usually and normally the servant of one master has become specially and temporarily the servant of another … is ordinarily a question of fact." *Hauseman*, 793 So.2d at 736 (citations omitted); *see also Coleman v. Steel City Crane Rentals, Inc.*, 475

---

third parties injured on account of the borrowed servant's negligence in the scope of the borrowed-employment relationship") (citations and footnote omitted).

So.2d 498, 501 (Ala. 1985) ("If reasonable persons can reach different conclusions on the question of whether a servant of one employee has temporarily become the servant of another, it is a question of fact for the jury."). Moreover, "[i]n the absence of evidence to the contrary, there is an inference that the servant remains in his general employment so long as, by the service rendered another, he is performing the business entrusted to him by the general employer." *Defoor*, 694 So.2d at 1304 n.2 (citations omitted).

The summary judgment record does not establish that Florida Van Lines has conclusively, unambiguously met its burden of proof as to this affirmative defense. As stated above, the right of control is the crucial determinant of an employee's "borrowed servant" status. Defendant's only showing on this point is a generic, conclusory statement in an affidavit that Pack & Load "borrows laborers from other companies to perform packing and loading for its clients" and that "[t]he borrowed employees work for and under the control of Pack and Load Services." (J. Prescott Aff., ¶ 5.)[15] On this record, defendant presents no information as to what arrangements were made between Florida Van Lines and Pack & Load vis a vis directing Williams' activities on the dates in question, whether Pack & Load in fact exercised control over Williams at that time, who paid Williams for his efforts, who furnished Williams with the equipment he used (evidently the moving truck and uniform were supplied by Florida Van Lines,

---

[15] In its summary judgment brief, defendant seeks to augment this bare-bones showing via representations of counsel that Fred Williams "was hired by Pack and Load Services at a rate determined by Pack and Load Services, for a duration determined by Pack and Load Services, and was later paid by Pack and Load Services." (Doc. 29, at 9.) The cited record materials do not prop up these specific factual propositions. The Jerry Prescott Affidavit (the lone exhibit cited by defendant for these facts) says nothing about who hired Williams, how he came to work the Stabler job, who directed his activities on-site, or who compensated him for his labors. Of course, unsupported statements of fact in a Rule 56 brief are not evidence, and cannot properly be considered. *See, e.g., Ellis v. England*, 432 F.3d 1321, 1326 (11th Cir. 2005) ("mere conclusions and unsupported factual allegations are legally insufficient" on summary judgment); *Sharpe v. Global Sec. Int'l*, 766 F. Supp.2d 1272, 1282 n.9 (S.D. Ala. 2011) (where statements of fact in a brief are accompanied by record citations that do not support them, "the Court cannot accept counsel's representations of fact and will not independently examine uncited portions of the record in search of support for a particular proposition"). And defendant's suggestion that "the only job that was performed by [Williams] was packing and loading" (doc. 29, at 9) appears counterfactual, given (i) the paucity of record evidence to support it, and (ii) the reasonable inference from the record that Williams in fact transported those household goods to New Orleans, such that he did far more than mere packing and loading, and that he performed those transport services for Florida Van Lines, not Pack & Load.

not Pack & Load), or whether Pack & Load had the ability to terminate its relationship with Williams in favor of someone else.  We do not know who told Williams to appear at Stabler's home on moving day, to which supervisors and which company he reported for instructions and progress updates as the packing and loading processes unfolded, or to what extent Florida Van Lines was calling the shots with regard to Williams' activities.[16]  In short, the record reveals unanswered fact questions as to whose work the Florida Van Lines employee was performing during the Stabler job and under whose control he was doing it.  Thus, Florida Van Lines has not satisfied its burden of proof at this time.

Insofar as Florida Van Lines maintains that the borrowed servant doctrine entitles it to summary judgment on the packing and loading claims, the Motion for Summary Judgment is **denied** because, given the underdeveloped record in critical respects, defendant has not met its burden of proof on this affirmative defense.

### B. *Carmack Amendment Preemption.*

In the alternative, Florida Van Lines argues that all of plaintiff's state-law causes of action are preempted by the Carmack Amendment, 49 U.S.C. § 14706.  For her part, plaintiff contests the breadth of Carmack Amendment preemption, and insists that at least certain of her state-law claims are not preempted.  Plaintiff has the upper hand on this issue.

---

[16]   At best, Florida Van Lines makes a generic citation to the collection of documents found at Exhibit E to its summary judgment submission, and states with a sweep of the hand that those documents "clearly support that … on the days the packing and loading took place, the FVL driver was an employee under the control of Pack and Load Services."  (Doc. 29, at 10.)  Exhibit E is a composite exhibit consisting of correspondence, estimates and work orders for the Stabler job, some containing semi-legible handwritten notes by an unidentified person working for an unidentified company at unspecified times.  Given the perfunctory argument on this point, the Court cannot discern from the face of this exhibit how these documents support Florida Van Lines' position that Williams was working under Pack & Load's control.  Of course, the undersigned will not speculate or guess as to facts outside the record, and cannot fill in the blanks in the record with explanations never provided, in order to resolve the Rule 56 Motion in movant's favor.  *See, e.g., Pears v. Mobile County*, 645 F. Supp.2d 1062, 1081 n.27 (S.D. Ala. 2009) ("The parties … cannot be heard to balk if the undersigned does not perform their research and develop their arguments for them."); *York v. Day Transfer Co.*, 525 F. Supp.2d 289, 301 n.10 (D.R.I. 2007) ("It is not enough merely to mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones.") (citation omitted).

Enacted in 1906, the Carmack Amendment creates a comprehensive "national scheme of carrier liability for goods damaged or lost during interstate shipment under a valid bill of lading." *5K Logistics, Inc. v. Daily Exp., Inc.*, 659 F.3d 331, 335 (4th Cir. 2011) (citation omitted); *see also Smallwood v. Allied Van Lines, Inc.*, 660 F.3d 1115, 1121 (9th Cir. 2011) ("The Carmack Amendment governs the terms of interstate shipment by domestic rail and motor carriers."). "The princip[al] purpose of the Carmack Amendment was to achieve national uniformity in the liability assigned to carriers." *York v. Day Transfer Co.*, 525 F. Supp.2d 289, 297 (D.R.I. 2007) (citation and internal quotation marks omitted).

"To accomplish the goal of uniformity, the Carmack Amendment preempts state law claims arising from failures in the transportation and delivery of goods." *Smith v. United Parcel Service*, 296 F.3d 1244, 1246 (11th Cir. 2002); *see also 5K Logistics*, 659 F.3d at 335 (describing Carmack Amendment as "a comprehensive exercise of Congress's power to regulate interstate commerce," and opining that "there can be no rational doubt but that Congress intended to take possession of the subject and supersede all state regulation with reference to it") (citation omitted); *REI Transport, Inc. v. C.H. Robinson Worldwide, Inc.*, 519 F.3d 693, 697 (7th Cir. 2008) ("The Carmack Amendment generally preempts separate state-law causes of action that a shipper might pursue against a carrier for lost or damaged goods.").[17] "The Supreme Court of

---

[17] The complete preemptive effect of the Carmack Amendment is well settled in the case law. *See, e.g., U.S. Aviation Underwriters, Inc. v. Yellow Freight System, Inc.*, 296 F. Supp.2d 1322, 1339 (S.D. Ala. 2003) ("Congress intended the Carmack Amendment to provide the exclusive cause of action for damage to goods in interstate transportation by a common carrier."); *Chatelaine, Inc. v. Twin Modal, Inc.*, 737 F. Supp.2d 638, 641 (N.D. Tex. 2010) ("The Carmack Amendment preempts state law claims against interstate motor carriers and provides the exclusive cause of action for loss or damages to goods arising from interstate transportation. … Further, the Carmack Amendment preempts all state claims that seek to recover damages to, or for loss of, goods during shipment, and for misdelivery or untimely delivery of goods."); *Certain Underwriters at Lloyd's London v. BE Logistics, Inc.*, 736 F. Supp.2d 1311, 1314 (S.D. Fla. 2010) (Carmack Amendment "establishes a national liability policy for interstate carriers, and preempts all state and federal common law claims"); *Custom Rubber Corp. v. ATS Specialized, Inc.*, 633 F. Supp.2d 495, 515 (N.D. Ohio 2009) ("the Carmack Amendment was intended to preempt causes of action against an interstate motor carrier for fraud, tort, and intentional and negligent infliction of emotional distress in addition to action for breach of contract") (citation and internal marks omitted); *Solectron USA, Inc. ex rel. Fidelity & Deposit Co. of Maryland v. FedEx Ground Package Systems, Inc.*, 520 F. Supp.2d 904, 908 (W.D. Tenn. 2007) ("the Carmack Amendment, when it applies, converts a state common-law claim into a federal question claim" by virtue of the complete preemption doctrine).

the United States has described the preemptive effect of the Carmack Amendment very broadly. … The Carmack Amendment embraces all losses resulting from any failure to discharge a carrier's duty as to any part of the agreed transportation." *Smith*, 296 F.3d at 1249 (citations and internal quotation marks omitted).

Plaintiff apparently concedes that her state-law claims relating to household goods that were packed, loaded and transported to New Orleans are preempted by the Carmack Amendment. There being no dispute on this point, the Court will **grant** the Motion for Summary Judgment insofar as it seeks dismissal (on Carmack Amendment preemption grounds) of all state-law claims for loss or damage of Stabler's household goods that were packed, loaded and transported to New Orleans. The Carmack Amendment provides Stabler's exclusive remedy for those claims.[18]

Notwithstanding the existence of expansive Carmack Amendment preemption, plaintiff maintains that "[a]s to any items not placed in interstate commerce (not shipped) but simply packed and loaded, valid state law claims have been pled." (Doc. 35, at 8.)[19] She elaborates that the claims she contends are not preempted are those relating to the "packing and loading onto

---

[18] As to all of plaintiff's claims preempted by the Carmack Amendment, the preemption effectively transforms them into federal claims. *See U.S. Aviation*, 296 F. Supp.2d at 1339 (where state-law claims are preempted by the Carmack Amendment, "through the magic of jurisdictional alchemy" those "claims morph into a federal Carmack Amendment claim") (citation and internal quotation marks omitted). Because Stabler has already asserted a separate Carmack Amendment cause of action against Florida Van Lines, those morphed state-law claims are redundant and retain no distinct, independent identity of their own.

[19] To be clear, the Court does not understand plaintiff to be arguing that packing and loading activities are, by their very nature, inherently beyond the ambit of the Carmack Amendment. Such an assertion would be incorrect, as a matter of law, given the statute's broad definition of covered transportation services. *See York*, 525 F. Supp.2d at 301 (transportation services covered by the Carmack Amendment include activities relating to movement of goods, "including arranging for, receipt, delivery, elevation, transfer in transit, … storage, handling, packing, [and] unpacking") (citations omitted); 49 U.S.C. § 13102(23)(B) (defining "transportation" for Carmack Amendment purposes as including services related to the movement of property, such as "storage, handling, packing, unpacking" and the like). Rather, the Court understands Stabler's position to be that the "interstate commerce" requirement is not satisfied as to those goods that defendant packed and loaded into the PODS units, inasmuch as those storage containers were never intended to leave – and never in fact left – the State of Alabama.

PODS units [of] certain of the Plaintiff's belongings which were not placed in interstate commerce but rather … [were] transported by a separate company to the Brookley facility." (*Id.* at 9.) Plaintiff identifies no case authority in which a court has deemed Carmack Amendment preemption inapplicable in analogous circumstances.[20] Nonetheless, it is abundantly clear that the Carmack Amendment does not apply to claims for loss of or damage to household goods in an intrastate move. *See, e.g., Farrah v. Monterey Transfer & Storage, Inc.*, 555 F. Supp.2d 1066, 1068 (N.D. Cal. 2008) (Carmack Amendment does not apply where "Plaintiff alleges that she arranged for Defendant to package and transfer her personal property from her home in Pebble Beach, California, to Defendant's storage facility in Salinas, California."); *Burkett v. Fox Moving and Storage of Tennessee, LLC*, 2010 WL 5184828, *3 (M.D. Tenn. Dec. 15, 2010) ("the Carmack Amendment has no application – and thus does not preempt state-law claims – if the plaintiff's claims concern a carrier who has merely transported property within a state"); *Starling v. Grosse Pointe Moving Co.*, 2010 WL 457114, *3 (E.D. Mich. Feb. 3, 2010) ("the Carmack Amendment does not apply when goods are shipped entirely within a state, that is, shipped in intrastate commerce") (citation and internal marks omitted); *Green v. All Star Moving and Storage, Inc.*, 2000 WL 422339, *1 (D. Kan. Mar. 31, 2000) ("The Carmack Amendment applies to interstate commerce, and has no application to purely intrastate commerce."). Indeed, the Carmack Amendment only provides "the exclusive cause of action for loss or damages to goods ***arising from the interstate transportation of those goods*** by a common carrier." *Hoskins v. Bekins Van Lines*, 343 F.3d 769, 778 (5th Cir. 2003) (emphasis added).

As to the household goods that Florida Van Lines packed and loaded into the PODS units, the summary judgment record unequivocally shows that those storage units were never intended to be transported to Stabler's apartment in New Orleans. Rather, it was always contemplated and agreed by the parties that the PODS units, once filled with household goods at Stabler's Ono Island, Alabama residence, were to be transported on an intrastate basis to a storage facility at Brookley Field in Alabama. This was a purely intrastate transaction, then, and would appear on its face to be beyond the reach of the Carmack Amendment, which applies

---

[20] Such an omission is at plaintiff's peril. *See generally Minemyer v. B-Roc Representatives, Inc.*, 695 F. Supp.2d 797, 809 (N.D. Ill. 2009) ("this is an adversarial system. It is not a court's task to research legal arguments on a party's behalf. … Arguments made without any citation to pertinent authority need not be considered.").

exclusively to goods shipped or transported in interstate commerce. Notably, defendant offers no response to this argument, and advances no theory or rationale for how the interstate commerce requirement might be satisfied as to plaintiff's state-law claims related to lost or damaged goods in the packing and loading of the PODS units.[21] Accordingly, those claims arising from loss or damage to goods packed, loaded and shipped exclusively on an intrastate basis are not completely preempted by the Carmack Amendment. Defendant's Motion for Summary Judgment is properly **denied** insofar as it relates to those specific causes of action.

### C. The "Acts of Shipper" Defense under the Carmack Amendment.

Finally, Florida Van Lines maintains that all of plaintiff's claims under the Carmack Amendment are barred by that statute's "Acts of Shipper" defense.

The undersigned has previously set forth the burden-shifting analysis applicable to Carmack Amendment claims in the following terms:

> "A plaintiff must first establish a *prima facie* case, proving by a preponderance of the evidence that (1) the goods were delivered to the carrier in good condition, (2) the goods arrived at the destination in damaged condition, and (3) a specified amount of damages resulted. … If the plaintiff makes a sufficient showing at the *prima facie* level, the burden shifts to the defendant to prove both that it was not negligent and that the damage was caused by one of five excusable factors, including: (i) an act of God, (ii) public enemy, (iii) act of the sender of the goods, (iv) public authority, or (v) the inherent vice or nature of the goods. … If the carrier/defendant fails to meet its burden, then liability is established, leaving only the question of damages."

*U.S. Aviation Underwriters, Inc. v. Yellow Freight System, Inc.*, 296 F. Supp.2d 1322, 1339 (S.D. Ala. 2003) (internal citations and quotation marks omitted); *see also REI Transport*, 519 F.3d at 699 (*prima facie* case under Carmack Amendment requires showing of delivery in good

---

[21] At most, Florida Van Lines theorizes that even if the packing and loading of the PODS units were activities beyond the reach of the Carmack Amendment, "FVL is not the proper party to assert those claims against as it was not responsible for that activity." (Doc. 38, at 3.) This statement collapses into defendant's "borrowed servant" theory, which has already been considered and rejected for summary judgment purposes. Again, there is evidence in the record that a Florida Van Lines general employee packed and loaded these goods. Unless the "borrowed servant" affirmative defense applies, Florida Van Lines is responsible for its employee's conduct to the extent that he improperly packed and loaded goods into those containers. As discussed *supra*, genuine issues of fact remain as to whether the Florida Van Lines employee does or does not fall within the narrow confines of the "borrowed servant" defense in this instance; therefore, summary judgment is not appropriate.

condition, arrival in damaged condition, and damages, after which defendant must show both that it was free from negligence and that damage to cargo was due to an excepted cause relieving it of liability); *Pacific Indem. Co. v. Pickens Kane Moving & Storage Co.*, 655 F. Supp.2d 1023, 1026 (D. Ariz. 2009) ("A shipper establishes its *prima facie* case under the Carmack Amendment when it shows delivery of the goods to the carrier in good condition, arrival in damaged condition, and the amount of damages."); *Custom Rubber Corp. v. ATS Specialized, Inc.*, 633 F. Supp.2d 495, 509 (N.D. Ohio 2009) (adopting like standards for *prima facie* showing and defense under Carmack Amendment).

      For summary judgment purposes, Florida Van Lines has not challenged Stabler's ability to make out a *prima facie* case under the Carmack Amendment. Instead, it invokes the "acts of shipper" defense. Its sole argument in support of that defense is that Stabler admitted in her deposition that she had actively participated in packaging certain items and had monitored the workers as they packed and loaded her goods. This evidence, by itself, is wholly inadequate to establish Florida Van Lines' entitlement to that defense, as a matter of law. Again, the carrier's burden after a *prima facie* case is made is "to prove that it was not negligent and that the damage was caused by an event excepted by the common law." *5K Logistics*, 659 F.3d at 335. These are conjunctive, not disjunctive, requirements. *See, e.g., REI Transport*, 519 F.3d at 699 (defendant's burden in Carmack Amendment action is "to show **both** that it was free from negligence **and** that the damage to the cargo was due to one of the excepted causes") (emphasis added); *Man Roland, Inc. v. Kreitz Motor Exp., Inc.*, 438 F.3d 476, 479 (5th Cir. 2006) (to overcome presumption of negligence in Carmack Amendment case after plaintiff makes *prima facie* showing, carrier must show "that it was free from negligence *and* that the damage was … attributable to … the shipper") (citation omitted). Defendant does not assert, much less show, that there are no genuine issues of fact as to whether it was negligent. Nor does defendant identify any evidence that Stabler's participation in the packing of certain boxes, and her oversight of certain of the packers' actions, <u>caused</u> the loss or damage of which she complains herein. In other words, Florida Van Lines does not even suggest, much less prove, that the damaged or lost household items sustained damage or loss because Stabler packaged them poorly, or because of errors or defects in Stabler's instructions to the packers. Instead, defendant goes no further than to point to Stabler's testimony that she packed some boxes herself and was otherwise involved in the moving process. There is no record evidence, for example, that Stabler

-18-

actually packed any of the damaged goods, much less that deficiencies in her packing efforts caused the damage to those items. To state that Stabler participated in the packing of her goods cannot be equated, without more, to a showing that Stabler's acts caused the damage to her cargo. Defendant has identified no evidence of any such causal nexus, and offers no factual basis that might support such a vast logical leap.

Because defendant has not established as a matter of law that it was free from negligence or that Stabler's own acts caused the loss and damage of which she complains herein, summary judgment is not properly granted to defendant on its "acts of shipper" defense.

**IV.   Conclusion.**

For all of the foregoing reasons, the Motion for Summary Judgment (doc. 28) is **granted in part**, and **denied in part**. The Motion is **granted** as to plaintiff's state-law claims (other than those relating to the packing and loading of the PODS units for intrastate transport) on the ground of Carmack Amendment preemption. In all other respects, the Motion is **denied**.

DONE and ORDERED this 6th day of January, 2012.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE